(38 South. 648.)

No. 15,298.

CRUSEL v. HERMITAGE PLANTING & MFG. CO., Limited.*

*114 920/125 904*

(April 24, 1905.)

**SALE—BREACH OF CONTRACT—ACTION BY SELLER—EVIDENCE.**

This is a suit brought by plaintiff to recover from defendant on a contract of sale of oil, the defense being that the contract was terminated by reason of the failure of the plaintiff to comply with an obligation, alleged to be contained therein, to deliver the oil at a fixed date, it being asserted that plaintiff was in default not only by the terms of the contract, but by being additionally placed in default. *Held*, for reasons assigned, that the defense was not sustained.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by J. Edward Crusel against the Hermitage Planting & Manufacturing Com-

---

*Rehearing denied May 22, 1905.

pany, Limited. Judgment for plaintiff, and defendant appeals. Affirmed.

Samuel Louis Gilmore and Thomas Horace Thorpe, for appellant. T. M. & J. D. Miller, for appellee.

### Statement of the Case.

NICHOLLS, J. The negotiations between these parties commenced with a letter from the plaintiff to the defendant, dated May 13, 1903, in which the writer said:

"This is to enquire of you if you have purchased your oil for next season's grinding, and if not if you want to take it deliverable between June 1st and August 1st. I am prepared to take a few contracts for delivery at that time."

On the next day (May 14th) defendant wrote to plaintiff:

"Please let us have your lowest price on 7500 to 10,000 barrels oil, delivered Hermitage Plantation."

On May 18th plaintiff answered, saying:

"Yours May 14th duly to hand. I expect to give you price on the oil you want the middle of this week, when I shall have made arrangements for transportation."

Plaintiff testified that after this exchange of letters he and Mr. Maginnis met on the street and made the verbal contract, referred to in his pleadings, in the simple form that he was to deliver 7,500 barrels at $1.12 before the 1st of August. There was nothing said at that particular time about a written contract, because they were walking on the street. There was no agreement which should be reduced to writing; he (Crusel) considered himself bound to deliver him that oil, no matter what direction the price of oil might take; he had the oil on hand in Beaumont, Tex., having purchased it a short time before. The market price was then $1.15 to $1.50 a barrel. The oil was to be delivered before the 1st of August, and not until such time as Mr. Maginnis' plantation was through running off their seconds, in order to have the oil in the tank, burnt

and to make room for 7,500 barrels. There had been somewhere at the time between 1,500 or 2,000 barrels left over from the previous year. Mr. Maginnis made the point that he had to have the oil in his tank before August, because he wanted to go North with his family in August. He wanted to be sure that he had it in his tank.

On the 25th of May plaintiff wrote to the defendant:

"I most likely will close a deal this week whereby I will close transportation in order to furnish you oil and place it in your tank either the latter part of June, or the first days of July. If I accomplish this I will most likely be able to place the oil in your tank at $1.25 per barrel. Will you be able to take care of full 7500 barrels?"

On the 4th of June plaintiff sent to the defendant for his signature—a writing purporting to evidence the contract for the oil. Defendant refused to sign, and wrote to the plaintiff that he rejected the whole purchase.

On June 6th plaintiff wrote to defendant, saying:

"I have yours June 5th, and have duly noted contents. The form of contract sent you is only a general form, same as has been adopted for all purposes. As for the 7500 bbls oil sold you I will arrange with you contract which will be altogether satisfactory if you want one which will be merely the following:
"The delivery of 7500 barrels of Beaumont crude oil free of water in your tanks at your plantation the last days of June or about the 1st days of July for the price of $1.12 bbl. Terms cash upon delivery. I know the conditions of your tank, etc., distance from the river, etc. All that is agreeable and you understand that you are to put the pipe out so as to get within easy distance of the barge same as you did last year. I shall be in New Orleans next week and will see you about the matter. Meanwhile, I consider the contract closed and even if there wasnt a line between us you have my word and I have yours."

On June 9th defendant wrote to plaintiff at Beaumont:

"Replying to your letter of the 6th, your explanation of the agreement between us in regard to the 7500 barrels of oil is satisfactory, with the exception of time allowed to you for the settling of the oil. I have always contended that it would take several days for the water to settle. We can arrange this later."

On June 10th plaintiff wrote to defendant from Beaumont:

"I shall be in New Orleans on Saturday the 13th. If you are in town telephone me so we can get together and close the contract to your satisfaction."

On the 19th of June plaintiff wrote from Beaumont:

"Will your tank be empty and ready to receive your oil after the latter part of next week. I wish to order the vessel loaded and send the oil forward. Please phone my office and drop me a line here stating what your position is."

On the same day (19th of June) defendant wrote to plaintiff at the Hennen building:

"You can send the oil we are now ready to receive it. We have some oil in the tank now but it will not interfere with your delivery."

On the 23d of June plaintiff wrote:

"I have yours of the 22nd. Since speaking to you yesterday I find that the river is above the pipe line of several of the parties that I am to deliver oil at the same time I am to make delivery to your plantation, therefore conclude to postpone shipment of the oil and instead of letting it go forward, say this week, will send it, say, the second week of July and will advise you of the time. Meanwhile, I trust you will empty your tank so that I can give you the full amount calculated on."

On the 25th of June defendant wrote:

"Replying to yours of the 23rd we have made arrangements to run our second sugars June 29th, and expect to receive the oil contracted for as stated by you the first week of July. I hope you will have oil at our Hermitage Plantation before we run short of oil."

On the 27th of June plaintiff wrote from Beaumont.

"Your favor of the 25th instant forwarded here. I took up the matter of delivery of oil with the parties I am to furnish but was requested particularly not to send the oil next week as the water was getting over their pipes and it would be dangerous making the landings to deliver the oil. I had not understood that you were going to require some of the oil to run your second sugars. Havent you in your tank all that is required for that purpose? I am anxious to get the oil over at earliest possible time as I am paying storage on it, however I would not expect to send it if the barge cannot get to the landings to make the deliveries. I shall have to wait for the water to go down sufficiently for me to be able to get at the landings. Is not your landing in the same condition as the others?"

On the 29th of June defendant wrote to the plaintiff, addressed to the Hennen building:

"Replying to yours of the 23rd will state that we are ready to receive the oil. At present our pipe line is above water. We do not intend running out of oil. If your oil is not here in time we will buy oil from others and consider your contract cancelled on account of your not delivering oil as agreed week ending July 4th."

Plaintiff testified that on July 1st he called to see Mr. Maginnis about the statement he made that the oil was to be delivered on the 4th of July, or to dry off sugars; that he did not know that, but, to prove that he (Crusel) had made the contract with the transportation company to carry it off on August 1st (?), he (Crusel) called at his office on July 1st, but he was not there, and on July 2d he had a conversation with him, and he said that he wanted no friendship matters to come in, and that witness must not expect any, and witness said he did not expect that; if he wanted any oil, to notify witness then and there, and he would send him oil from New Orleans to dry his sugar as a favor.

That was on July 2d in Mr. Maginnis's office at 10 o'clock. Witness told him the oil was being loaded at Beaumont. He made no objection, but that he wanted some little oil to get through with his sugar. He said he was going up to the plantation, and in case he wanted any oil he would ring him up and let him know. On the 4th of July, it being a legal holiday, witness stayed in his office all day, as also all day Sunday, July 5th, but he had no message, and on Monday, the 6th of July, no message came. At 2 o'clock witness was at the Pickwick Club, and as Mr. Maginnis was leaving he said, "Eddie, I want oil on Thursday" (July the 9th), and walked straight out. Witness heard no further, but on the next afternoon (July 7th), about 12 o'clock, a letter dated July 6th came through the mail, stating, "We need oil on Thursday morning." He did not

say how much. Witness did not suspect that he was trying to abrogate his contract, but he knew that the price of oil was falling considerably.

On July 7th plaintiff wrote:

"I have your favor of July 6th. I shall endeavor to see you this afternoon before going to Beaumont for which place I leave to-night. Most likely your oil is loaded now and in transit, but I don't look for it at the mouth of the river until Thursday sometime. The barge will then have to make the run up to your place. You have given me frightfully short notice, however. I shall see you in case you need a few barrels to get through your present run. I shall try to arrange to have it delivered to you."

On the 9th of July he telegraphed plaintiff at 3:45 p. m.:

"Your failure to deliver your oil as agreed on. We cancel contract."

On the 10th of July he telegraphed plaintiff:

"Your contract broken. Will not receive oil."

At that time the oil was in transit on the Gulf, and Mr. Maginnis knew it was sent that way.

Witness, on July 9th, wrote to defendant from Beaumont:

"Your telegram even date reading: 'Your failure to deliver oil as agreed on. We cancel contract.' I wired you immediately: 'Telegram received. Your oil is in transit. Have bill of lading in handwriting,' which I beg to confirm.

"I have the bill lading and sent it to my New Orleans office showing the shipment of 7500 bbls of oil to you. The notice that you cancel contract will not hold. I cannot accept it. Your oil is in transit. I have no more control over it. At the time of sale it was not stipulated that you should have the privilege of calling for this oil on a fixed day and to cancel the contract in case the oil did not reach your landing on that day. That would have been an impossibility for anybody to agree to such a contract. Neither I nor any one else in this business has such complete control of the transportation and can make delivery at one day close. When at your office last Thursday you told me that you were going to the plantation and that if you required any oil to run your sugars you would notify me by phone the next day at my office. I took the precaution to make arrangements to send some oil to you at once in case you needed it. You gave me no notice whatever, therefore I concluded that it was not absolutely necessary that you should have oil at once. Monday at the club when you met me casually you spoke over from one table to the other and said 'I want some oil on Thursday,' and Tuesday I received your letter of Monday which had my prompt reply. I had every reason to believe that the oil contracted for would be delivered to you in ample time and it no doubt will, and of course I expect you to receive it according to our understanding. Your stand in this matter is no doubt due to the fact that the market on oil has declined considerably. I am sorry to have to state that I certainly expected that you would fulfil your part every bit as faithfully as I would mine had conditions been reversed."

On July 10th defendant (to whom plaintiff had sent them) wrote to plaintiff:

"We herewith return your bill and receipt. R. T. Clark, Agt. for 7500 bbls of oil on account of your failure to deliver oil as per agreement our contract with you has been cancelled."

On the 11th and 13th of July the defendant purchased from the Louisiana Petroleum Company 515 barrels of oil for 87½ cents a barrel, which were placed in the defendant's tank at Hermitage on or about the 11th and 13th of July. At the time they were taken into the tank there was still on hand 583 barrels of oil remaining over from the stock of the season before.

The oil purchased from the plaintiff reached Hermitage plantation on the 17th of July, and defendant refused to accept delivery on the ground that the contract of purchase had been canceled. Plaintiff having threatened to keep the barge at the landing at defendant's expense, matters were arranged by an agreement that the oil should be placed in the tank for plaintiff's account, subject to settlement of the rights of the parties. Accordingly, 6,492 barrels of oil were transferred, but 999 barrels were not able to be received for want of room, resulting from the oil already in the tank. These 999 barrels were retained by the plaintiff, and sold out at a loss of $419.58 on the basis of the contract price of the oil between plaintiff and defendant.

Later on, the parties agreed that 6,592

barrels would be taken by the defendant at 70 cents per barrel, aggregating $4,544.40, and that the rights of the parties in respect to the contract due thereunder should be left to arbitration.

Proceedings taken to that end were taken, but failed by reason of difference as to what the particular issues to be submitted were. This suit followed.

On the trial Mr. Maginnis testified that he asked Mr. Crusel to give him a quotation on from 7,500 to 10,000 barrels of oil, which he did, and he named $1.12½ a barrel, and it was closed at that price. Shortly after he closed the price with him, witness was offered oil at less money, but, as he had already closed with plaintiff verbally, he refused to accept it. He testified that by plaintiff's first letter he was to deliver the oil in the latter part of June or 1st of July, and witness accepted and stood on that contract and price; that all the correspondence showed that plaintiff was to deliver the oil at the end of June, or the first week of July; that plaintiff wrote him asking whether he was ready to receive the oil, and his own letters would show that he was ready to receive the oil, and that he asked him to send it forward. Witness received afterwards a letter from plaintiff saying that, owing to the pipe line being under water, he was unable to deliver the oil. Witness answered he knew nothing about other planters; he wanted his oil. Witness never entered into a verbal contract by the terms of which witness would receive oil up to or on the 1st of August; his contract was in writing. Plaintiff could have delivered up to the 1st of July. Witness bought 515 barrels of oil from the Louisiana Petroleum Company on July 11th and 13th. This was while he was running out third sugars. Witness never agreed at any time, verbally or in writing, to receive the oil at a time subsequent to the time fixed in the contract. Witness wanted to get the oil soon. At the time he first bought it, he told plaintiff he thought of going away with his family, and he wanted the oil on the plantation before he left, and to be sure of having enough fuel to run off his third sugars; he did not have, he thought (on hand), over 18 inches in the tank; he thought he had got through running his third sugars on the 14th of July. In running his thirds he used nearly all the 500 barrels of oil he bought from the Louisiana Petroleum Company. He did not buy any oil between the 13th and the 17th of July. The capacity of his tank he was inclined to believe was 7,500 barrels. The reason why all of plaintiff's oil was not put into the tank was because he had some of his own there when it came. He had oil on hand when he bought.

On cross-examination witness said he thought he was occupied about two weeks in running off his thirds.

Being asked whether he really needed the oil bought from the petroleum company, he answered that if he had not received that oil he was afraid he would run short of oil and have to shut down his sugar house and wait for the arrival of plaintiff's oil. Witness did not use all the oil that he had on hand, including that bought from the petroleum company. Plaintiff knew all about the conditions on the place—the distance from the river to the tank. Witness had other receptacles for oil than the tank spoken of, but not connected. Witness did not deny having made a verbal contract to buy this oil at $1.12. This was before the contract was presented. Witness bought at $1.12½; plaintiff's original contract would show that, but he billed the oil to witness at $1.12. There is no dispute about the price. Mr. Daboval brought witness a written contract to sign a day or two after the arrangement. Witness refused to sign it. He made the marks which appear on that instrument, which was testified to by Mr. Daboval. When the clause in regard to time of deliv-

ery was reached, witness did not state to Mr. Daboval that "he wanted the oil before August," as was stated in the memorandum on the instrument placed there at the time by Mr. Daboval—"wants oil before August."

He saw Mr. Daboval make the memorandum. Witness stated that when he originally bought the oil from plaintiff he told him that he wanted to go away, and have the oil in the early part of July before leaving, and that was one of the reasons why he refused to sign the contract presented to him by Mr. Daboval. He indicated to plaintiff that he expected to go away in July, from the 15th to the 20th; he didn't mention the time; he did not think he had told plaintiff that he wanted to go away about the 1st of August, and that he wanted to be sure that he had his supply of oil on his plantation for the coming year. Asked to state as a matter of fact what use he had for the oil there except to have it for the coming season, witness said that, if his sugar had granulated as in previous years, he would require considerable more oil than he had used. Witness told plaintiff that he would have to start the sugar house, and would be working off his own oil by the time plaintiff got his oil there—by the latter part of June. By the latter part of June, or the 1st of July, he would be ready to receive him. Being asked, "You say you were going to run off your third sugars on the 29th of June?" answered, "Yes, sir, about that time." Being asked what he meant by writing plaintiff on the 22d, "You can send oil—some in tank now, but not to interfere"—how he was going to get the oil in there? answered, his object was to get the tank full. The oilmen don't make complete delivery in one trip, and, if the tank had been filled on his trip, on June 22d he would have had ample opportunity to deliver the balance after witness had run off second sugars. Being asked, "When Mr. Crusel indicated a willingness to supply you with any little extra oil

that you wanted in the early part of July, why didn't you give him that opportunity?" answered:

"I was on the plantation when he spoke to me and told me to let him know by telephone. I think it was the 2d or 3d of July, and I never gave it a thought that the following day was a legal holiday, and I didn't go to the telephone at all on that day."
"Q. You disappointed him?
"A. Yes, sir."

When witness wrote to plaintiff on the 25th of June that he had arranged to run seconds on the 29th, and expected to receive the oil contracted for the first week in July, saying, "Hope to receive oil before we run short," he had oil then, but did not know how much. He could have ascertained how much he had.

### Opinion.

From the testimony introduced on the trial of this case, as well as from the probabilities drawn from the conditions then existing to the knowledge of both parties, we are of the opinion that the verbal contract declared upon and its terms have been proven. We are also satisfied that when it was created the parties did not contemplate that it should be subsequently evidenced by a writing, still less that its existence should be made to depend upon that fact. After the contract was complete, plaintiff sent by Mr. Daboval, his clerk, a writing to be signed by Mr. Maginnis, the president of the defendant company. The latter refused to do this, and wrote to the plaintiff rejecting the whole purchase. If the writing presented to him contained clauses or conditions not warranted by the facts, he had the legal right to decline affixing his signature, leaving the rights and obligations of parties to be tested thereafter through legal proceedings, if necessary. This refusal to sign, and declaration that he rejected the purchase, did not carry with them the setting aside of the contract, if it really existed. The plaintiff testified that the writing which

he sent to defendant was the general form of contract of that character; that his reason for sending it was that he needed advances of money; that the price of oil had gone down, and he wished to be able to show parties from whom he desired to borrow that he had outstanding contracts at good prices with reliable parties.

The letter written by the plaintiff to defendant in answer to that stating that the latter rejected the purchase is taken by defendant as an admission and recognition of the fact that the contract was "off," and that a new written contract was proposed thereby, which he himself accepted by his reply thereto. We do not think that position maintainable. Plaintiff, on the contrary, stated he considered the contract closed. His letter was simply expressive of a willingness and an intention to conform to defendant's expressed desire to have his stock of oil on hand before he and his family left for the North. Plaintiff says that defendant told him that would be about the 1st of August. Defendant does not deny that. He says that he did not think he had mentioned any date; that his intention, in fact, was to leave about the 15th or 20th of July. In defendant's letter to plaintiff, which he urges was an acceptance of a new and written contract, he refers to plaintiff's letter as one "explanatory" of the situation. The conclusions which we have reached in this case. make a decision upon this point a matter of no special importance, for, accepting the position taken by him to be true, we do not think that the course which he pursued later was justified in law. In this connection we may here state that defendant was advised as to the place at which plaintiff had bought the oil, and the manner in which it· was to be transported to his plantation from Port Arthur. We may also state that plaintiff was at liberty, should he elect so to do, to forward the oil from New Orleans in some other way. We do not think that

plaintiff bound himself to deliver the oil on any particular day "fixed," so that a failure to deliver on that particular day could be held to operate ipso facto a breaking up of the contract. A declaration by plaintiff of intention to deliver in the last days of June, or the first days of July, did not authorize the defendant to himself select a particular day and notify plaintiff that if he did not deliver on that day the contract would be canceled, particularly when the fact upon which the selection of that day was made to rest was the day upon which he should be running his second or third sugars, a "movable" day which he could arbitrarily advance so as to suit his interest and render compliance by the plaintiff impossible under existing conditions. If the defendant intended to hold plaintiff to delivery on a particular day or on particular days, he should, under the circumstances of this case, have notified him of such intention in time to have enabled him to have complied. This he did not do. On the contrary, his course was such as to throw plaintiff off his guard, and induce him to abstain from taking steps by which delivery on.that day or on those days could have been made from New Orleans. We do not think that plaintiff was put in default. We do not think this was accomplished by a mere notice to him, given by defendant on the 6th day of July, that "we will need oil on the 9th." Cotton v. Irrigation Co., 108 La. 8, 32 South. 195.

The notice did not state how much oil he wanted at that time, and he was not in position to have received at that time delivery of the whole quantity of oil which had been purchased, as there was then a considerable quantity of his oil in his tank which had remained over from his stock of the year before. Defendant did not in fact need oil at that time. He not only had enough with which to run out his sugars, but he had more than enough. Defendant says that he feared that he might run out, and that plaintiff

could have made a partial delivery. Defendant could not have exacted a partial delivery if the parties were to stand on their legal rights. The notice given to plaintiff "that we will need oil on Thursday" was calculated, as we have said, to throw plaintiff off his guard, for it had been agreed between plaintiff and defendant that, if the latter needed some oil to tide him over in running out his sugars, he would telephone plaintiff to that effect, and plaintiff had agreed to supply him. He failed to telephone. On the contrary, he followed up the notice shortly after by a notice that he had canceled the contract and would not receive the oil. This he could not accomplish at will. Defendant acknowledged to Mr. Landry, of the Louisiana Petroleum Company, after that announcement, that he could not purchase oil from him unless he could abrogate outstanding contracts—evidently that with the plaintiff. The course pursued by the defendant in seeking to exact, as rigorously as he did, delivery of the oil at a time selected by himself, would have impressed us much more favorably than it does had the price of oil remained up, instead of falling, as it did.

We have considered this case very carefully, and we are of the opinion that the verdict of the jury and the judgment of the court thereon are sustained by both law and equity, and they are hereby affirmed.