(52 South. 222.)

No. 17,897.

BARNETTE SAWMILL CO. v. FT. HARRISON LUMBER CO.

(March 28, 1910. Rehearing Denied April 25, 1910.)

*(Syllabus by Editorial Staff.)*

1. SALES (§ 176*) — CONTRACTS — PERFORMANCE.

A buyer of the merchantable output of a sawmill for a specified period may insist on the seller properly performing the work in the future, though he has acquiesced in and settled past failures so to do.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 176.*]

2. SALES (§ 116*)—CONTRACTS—RIGHT TO TERMINATE.

A buyer of the merchantable output of a sawmill for a specified period is not warranted to terminate the contract because of past failures of the seller to perform the work, where such failures have been acquiesced in and settled, and from the assumption therefrom that the seller will continue to fail to perform the work, without a prior putting in default.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 116.*]

3. SALES (§ 175*)—CONTRACTS—PERFORMANCE.

A seller of the output of a sawmill for a specified period need not, in order to recover under the contract, continue sawing and delivering lumber after the buyer directed the seller to cease sawing and delivering, but was entitled to the benefits which would have resulted had the sawing and the delivering been continued to the end of the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 435; Dec. Dig. § 175.*]

4. SALES (§ 175*)—CONTRACTS—PERFORMANCE.

Where a buyer of the output of a sawmill for a specified period terminated the contract without grounds, that the seller had up to the time of the termination made no profits, and that after that date it was so financially embarrassed that it would have been unable to complete the contract, did not affect the right of the seller to recover for the breach; he having the right to assume that the buyer would pay for the lumber contracted for, and thus furnish the means necessary to carry on the business.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 435; Dec. Dig. § 175.*]

5. SALES (§ 384*)—CONTRACTS—DAMAGES.

Where a contract for the sale of the output of a sawmill for a specified period fixed the price of the lumber, and the evidence showed that the seller could have sawed without difficulty a specified quantity, that the stock on hand was sufficient to keep the sawmill employed during the period of the contract, and that the seller could have made a specified sum as profits by completing the contract, the seller was entitled to recover loss of profits for the buyer's wrongful breach of the contract.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 384.*]

Appeal from Third Judicial District Court, Parish of Bienville; W. U. Richardson, Special Judge.

Action by the Barnette Sawmill Company against the Ft. Harrison Lumber Company. From a judgment for plaintiff, defendant appeals, and plaintiff prays that the judgment be increased. Affirmed.

Stubbs, Russell & Theus, for appellant. Dorman & Reynolds and Richardson & Richardson, for appellee.

## Statement of the Case.

NICHOLLS, J. Plaintiff, representing itself to be a commercial partnership domiciled in the parish of Bienville, alleged: That said firm made and entered into a written contract to sell and deliver to the Ft. Harrison Lumber Company, a commercial firm running and operating an establishment at Briceland, La., as manufacturers and wholesale dealers in yellow pine, hard wood, and shingles, all lumber cut by them classing as No. 2 and up at the price and sum of $12 per thousand, which said lumber the Ft. Harrison Lumber Company agreed to accept and pay for on the 20th of each month commencing December 20, 1906, and the last payment to be made January 20, 1908, said contract being entered into November 26, 1906, and to run and extend to January 1, 1908, all of which would more fully appear from a duplicate of said contract annexed and made a part of its petition.

That they faithfully complied with said contract and delivered to the said company all lumber grading from No. 2 up sawed by them up to July 23, 1907, and the said Ft. Harrison Lumber Company accepted all lum-

ber delivered up to said July 23, 1907, and paid for all lumber delivered to July 20, 1907. That on July 22d, three loads of lumber were delivered worth $25 that was paid for at that time. That on July 23d, they delivered to the said Ft. Harrison Lumber Company two loads of lumber in accordance with the terms of said contract which the said Ft. Harrison Lumber Company would not receive and refused to accept, although under the terms of their contract it was their duty to accept said two loads of lumber, being worth $18, and that at the time that they refused to accept said two loads of lumber they ordered your petitioners not to send any more lumber on the contract as they would not accept same, thereby actively violating said contract.

That by said active violation of said contract the said Ft. Harrison Lumber Company had greatly damaged petitioners, and that they were justly and legally indebted unto petitioners for the full amount of all damages caused them by said active violation. That they had at much trouble and expense gotten their sawmill plant in good running and operating condition with the object and purposes of complying with said contract. That they were prepared to cut and deliver, and would have cut and delivered, to said Ft. Harrison Lumber Company at least 12,000 feet of lumber per day under said contract. That the cost of cutting and delivering said lumber was and is about $8 per thousand, making a damage to petitioner of $4 per thousand and profits of said lumber, and that they were unble to sell said lumber to other parties for more than $8 per thousand. That the amount of lumber petitioners could and would have delivered per month would have amounted to at least 312,000 feet per month, making the damage caused to petitioners by the said active violation of said contract by said Ft. Harrison Lumber Company amount to $1,248 each month, and, as said contract had five months before it expired, the entire damage

caused to petitioners would amount to $6,240.

That said active violation of said contract by the Ft. Harrison Lumber Company was willful, malicious, and in bad faith, and done, for the reason among others, that they had gotten their own mill in operation and in running order, and were no longer needing the service of petitioners and their mill, having used practically all the lumber received by them from petitioners' mill in building their mill buildings, sheds, tramways, dollways, etc., and for the further reason that the price of lumber had fallen considerably below what it was at the time the contract was made, and that said Ft. Harrison Lumber Company should be mulcted in the sum of $1,000 punitive damages for said violation of said contract.

That they filed suit on August 8, 1907, against the said Ft. Harrison Lumber Company, praying for judgment against said lumber company, ordering it to accept, receive, and pay for, at the rate of $12 per thousand, all lumber cut by petitioner grading No. 2 and up to the 1st day of January, 1908, according to the terms and conditions of said written contract, and further prayed that, in case the Ft. Harrison Lumber Company did not specifically perform and carry out all the terms and conditions of said contract, then, in that event, that petitioners have judgment against them for the sum of $6,240, with 5 per cent. per annum interest from judicial demand and for $1,000 punitive damages with 5 per cent. per annum interest from judicial demand and for the above-mentioned sum of $25 for three loads of lumber with 5 per cent. per annum interest from judicial demand, all of which would more fully appear from their said petition filed in suit of Barnette Sawmill Co. v. Ft. Harrison Lumber Co., No. 2693, on docket of the court, made a part of their petition by reference.

That upon the trial of said suit judgment

was rendered in favor of petitioners for said sum of $25, and that a judgment of nonsuit was rendered against the petitioners upon their demand for damages. That said sums of $6,240 and $1,000 damages are still due petitioners and unpaid, although amicable demand has been made.

In view of the premises, petitioners prayed for service and citation on the Ft. Harrison Lumber Company, and that after final hearing had they have judgment against it for the sum of $6,240 as actual damages and 5 per cent. per annum interest thereon from August 8, 1907, as punitive damages, and for costs and general relief.

Defendant, after pleading first a general denial, admitted the execution of the contract sued on, and its partial execution, and averred: That whatever violation there was of said contract was brought about solely by the fault of the plaintiff. Defendant averred that the lumber to be delivered to it under the terms of said contract was intended to be finished into a manufactured product and resold, except such portions of said lumber as were to be used in the construction of defendant's buildings, etc., at its sawmill site, which lumber to be used by defendant was not required to be finished and of a first-class merchantable grade of lumber to meet its needs. That at and prior to the alleged violation of the contract it had completed its buildings, and therefore could no longer use the output of plaintiff's mill except in the usual course of trade to be sold on the market, and that, on account of the inferiority of the lumber delivered and offered to be delivered under the contract, defendant was compelled to refuse same, as it was wholly unmerchantable, and could not be sold on the market as merchantable lumber, and could not be finished in the planer and other machines of defendant, all of which were and are first class, so as to make the same a good grade of merchantable lumber, and that the refusal of defendant to accept any portion of the output of plaintiff's mill was due solely to plaintiff's fault in actively violating the contract by tendering inferior and unmerchantable lumber.

Defendant specially denied that it at any time ever violated the terms of the contract by refusing to accept any lumber tendered or offered coming up to the classification and grades as specified in said contract, and offered in accordance with the contract, but, on the contrary, was willing and anxious at all times to receive all of the merchantable lumber sawed by plaintiff in accordance with the stipulations and terms and grades as specified in the contract, and repeatedly requested the plaintiff to saw and deliver lumber in accordance with the contract, which requests and demands were refused by the plaintiff.

In view of the premises, defendant prayed that the demands of the plaintiff be rejected at its cost and for general relief.

The district court rendered judgment in favor of plaintiff and against defendant for the sum of $3,120 for actual damages and 5 per cent. per annum interest thereon from date of this judgment and all costs.

Defendant appealed. Plaintiff prays that the judgment be increased to $4,500.

The contract referred to by plaintiff reads as follows:

"Briceland, La., Nov. 26th, 1906.

"For and in consideration of the sum of one dollars cash in hand paid, the receipt of which is hereby acknowledged and other valuable considerations, hereinafter specified, we, the Barnette Sawmill Co., composed of W. C. Barnette, J. S. Pryor, and G. W. Myers, do hereby grant, sell, and convey unto Fort Harrison Lumber Co., Limited, our entire mill cut, consisting of merchantable yellow pine lumber all grades from No. 2 up, and saw into such dimensions as the Fort Harrison Lumber Company may require from logs 12 to 20; said lumber to be delivered on the yards of the Fort Harrison Lumber Company not later than 48 hours from time of sawing unless the roads are in such condition that wagons cannot be hauled over them, in which case, we, the Barnette Sawmill Co., agree to stack the lumber on narrow strips and use every precaution to prevent same from blueing, afterwards delivering stacked lumber to the yards of the Fort Harrison Lumber Co., without any

additional charge. It is understood and agreed to by us that this contract is in force from date until January 1st, 1908, and the price of said entire mill cut of 32 and up is $12.00 per thousand delivered at the yards of Fort Harrison Lumber Co., to be paid as follows: November delivering due Dec. 20th, * * * the balance for each month due 20th of the succeeding month from date until Dec., 1907, which is due January 20th, 1908."

### Opinion.

At the time of entering into the contract of November 26, 1907, the plaintiff company had erected a sawmill at about five miles from Bryce Station, in Bienville parish, and owned timber in the immediate vicinity which it proposed to saw and to sell.

At that time the defendant company owned a large quantity of timber in the same neighborhood which it also proposed to saw and to sell. It had, however, no plant by means of which it could carry out its purposes, no sawmill, and none of the buildings needed for entering upon business. The situation was one which each party had great interest in taking advantage of. Out of it sprung the contract that has been copied on another page. Plaintiff commenced to execute the contract at once by sawing lumber and making delivery under it, the defendant receiving and using the lumber furnished. This continued up to July 22, 1907, on which day Mr. Pierson (defendant's president) wrote to the plaintiff the following letter:

"Mr. Beard—Dear Sir: Your people have violated your contract in more than one way and can't get you to cut out and haul lumber in shape we can handle it, and have given the boys much trouble since I have been gone and shut down when you got ready without notice so you need not bother about hauling any more lumber for it must be checked."

Plaintiff sought by conference to adjust the differences between the parties, but failed to do so, and this action, so far as it (the defendant) could do so, terminated the contract, although by its terms it was to continue until January 1, 1908.

On the 20th of July, 1907, two days before the letter just referred to was written, Mr. Pierson had written to Mr. Beard, as follows:

"Our Mr. Hearne advises us that you have been putting in a lot of very bum stuff and not in accordance to the contract. We can't stand for you to send such material as you have been and in such manner now as we have got our mill going. We also gave you a very important bill and you stopped sawing without notice to us. You have given us trouble all along, and if you want to play quit we will release you from all responsibility as far as your contract is concerned."

Referring to the contract and the question as to whether it had been violated and by whom, the district court in its opinion in the case says:

"In this connection some comment on the terms of the above-quoted written contract in evidence is proper. While the contract provided that 'the plaintiff would deliver to defendant its entire mill cut of merchantable yellow pine lumber all grades from No. 2 up, and sawed into such dimensions as defendant might require from logs 12 to 20; said lumber to be delivered on the yards of defendant not later than 48 hours from time of sawing unless the roads were in such condition that wagons could not be hauled over them, in which case, the plaintiff agreed to stack the lumber on narrow strips and use every precaution to prevent same from blueing, afterwards to deliver this stacked lumber to the yards of defendant without any additional charge,' there is nothing in the contract fixing any specific amount of lumber to be cut and delivered or stacked in any one month, but the contract provided that the entire mill cut of certain descriptions should be delivered, if cut within a specified time, or stacked in case of bad roads, and that the price of any calendar month's delivery of lumber should be due on the 20th of the following calendar month during the period of the contract commencing November 26, 1906, and ending January 1, 1908.

"The evidence, while somewhat conflicting, seems to establish the contention of defendant that a considerable percentage of the lumber deliveries was not up to the merchantable standard, or in accordance with the contract; but it is equally true that defendant had exercised the right to cull and reject all such unmerchantable lumber.

"This seems to have caused friction, and even some intemperate remarks and some inconvenience to defendant and exasperation to plaintiff, and possibly some slight loss might have resulted to plaintiff, which, however, was not imputable to defendant, whose general manager was not bound to accept any other than that part of each load which conformed to the contract. The plaintiff contends, and seems to have proved by a preponderance of evidence, that no unnecessary time was lost in sawing and deliv-

ering lumber under the contract. Want of water for steam necessitated a suspension of sawing until sufficient well and tank facilities could be provided; and bad roads resulting from protracted rains added other impediments to plaintiff's prompt delivering of lumber. These unpropitious conditions militated more against the Barnette Sawmill Company than the Ft. Harrison Lumber Company. The former suffered for the time of suspension the loss caused by having nothing to deliver, or by inability to deliver under the contract; whereas, after the latter had started its own mill, it could proceed without the mill cut of plaintiff, and did so proceed.

"Under the evidence adduced and referred to in a general way, it is apparent that the defendant terminated the contract by active violation under circumstances not justified by the facts, and under the laws the defendant incurred liability for whatever damage the plaintiff sustained as a consequence of such violation of said contract which could be reached only by consent of the parties or for causes acknowledged by law. There was no mutual consent of the parties and no apparent cause recognized by law. Whatever grievance defendant may have claimed, no legal redress was sought by an action for a specific performance or by an action for damages, not even in this suit are any damages claimed by reconventional demand. Claiming noncompliance with the contract on the part of plaintiff, the defendant chose rather to be a 'law unto himself' than to invoke the legal tribunals necessary under the law if defendant had cause sufficient which has not been shown even in this suit."

The defendant having (in the opinion of the court) incurred legal liability for unwarranted breach of the contract with plaintiff, the court said it became its duty to determine the amount of damages sustained by plaintiff and due by defendant.

It then proceeded to discuss the question of the amount of damages, and declared that:

"It was difficult for the court to arrive at any other than a reasonable estimate in the case —that the evidence did not warrant the court in allowing the full claim made for actual damages. Considering the fact that plaintiff did not use all the timber and that it is yet a valuable asset, and that, estimated on the uncertain weather conditions that prevailed the first half of the year, the anticipated mill cut of lumber for the unexpired period of the contract was too problematical to base a judgment on for more than half the sum of actual damages claimed. the judgment will therefore be for plaintiff and against the defendant for three thousand one hundred and twenty dollars ($3,120.00) and legal interest thereon from date of the judgment hereinafter rendered."

Defendant's counsel complain of the judgment appealed from, urging that it was justified by neither law nor proof. They insist that the claim is for anticipated profits, uncertain, conjectural, and speculative in character; that it leaves out of sight entirely the fact that because of fire, the blowing up of a boiler or many other possible and probable accidents to sawmills "the whole thing might have been put out of business; that it was absolutely impossible to say whether this mill would have operated for one day or for the whole unexpired term of the contract; that it was a physical and a legal impossibility to prove what damages the plaintiff sustained by the violation of this contract; that there was no proof as to the number of days upon which the mill could have been operated in view of possible weather conditions; that plaintiff had made no profits under the contract under its partial execution from November to July and could, and would, have made none had it been continued to January, 1908; that it was financially unable to have continued to operate after July 23, 1907, and did not attempt to do any sawing after that date for want of means not being able to saw even the logs which it had cut and hauled to the mill, and which were lying near it. It relies greatly upon Bergen v. City of Orleans, 35 La. Ann. 523, and Crow v. Sheriff, 45 La. Ann. 1227, 14 South. 122. It maintains that, the plaintiff company having actively violated its contract, it had itself the right to refuse to execute its part." The plaintiff says that in the Crow Case the court declared that "the possible profits must be proven with some degree of certainty," but in that case there was nothing certain, neither the price of the lumber nor the expenses of manufacture; whereas in the case at bar the price was fixed by the contract at $12 per thousand feet, the

entire expenses of manufacture has, including the value of the timber, been shown to be $8 per thousand feet, the contract was fixed to continue until a definite date, January 1, 1908; that the capacity of the mill was shown, and it was shown that the plaintiff company owned sufficient quantity of lumber to have executed the contract even if its termination had been fixed for a term six months longer than it was. Plaintiff claims: The defendant was not justified in terminating as abruptly as it did, and under the circumstances that this was done, the contract of November 26, 1906. That it bases itself upon alleged continued violations by plaintiffs of the contract, which, if true, were not considered of any importance by the defendant who received and paid for the lumber delivered and used it for their own purposes. That, while it was true that some little of the lumber which it had sawed was not exactly up to contract, defendant claimed and exercised the right of inspecting the whole and culling out, rejecting, and not paying for what was not satisfactory to it, and cutting off from lumber offered any part which was not believed suitable, receiving, and paying for only what remained. That, if the defendant had serious reasons for objecting to the lumber tendered it, it should have so stated and held plaintiff responsible when this happened.

That everything which had been done prior to July 23, 1906, had been acquiesced in and settled between the parties, and nothing occurred at that time to warrant its sudden and abrupt termination of the contract. That the real reason for its action was that the price of lumber had gone down far below $12, and it was therefore unwilling to continue the contract. That at that time defendant had completed its own mill, and had no further need of assistance from the plaintiff. That it did not pretend to have suffered any damage from anything done or left un-

done by the plaintiff and sets up no reconventional demand in this suit. That its expressed willingness to "play quits" with the plaintiff and to release it from all responsibility under the contract indicates plainly its desire to escape from responsibility under it. The two coincident facts referred to by the plaintiff of the large fall in the price of lumber and of the finishing of defendant's own mill, and being securely on its feet, to conduct its own operations of sawing and selling its own lumber from that time on, are certainly significant facts tending to establish reasons other than delinquency on the part of the plaintiff to which can be referred defendant's sudden determination to hold (plaintiff) strictly to its contract. The prior alleged falling short of the plaintiff in its obligations entered very little in our opinion as a factor in determining the defendant to receive no more lumber from the plaintiff under the contract.

The defendant had unquestionably the right to insist upon the plaintiff properly performing its work in the future; but it was not warranted in making past failures to do so (which had been acquiesced in and settled), and the assumption therefrom that plaintiff would continue to do so, the occasion, without a prior putting in default, for at once terminating the contract. A placing in default was an essential prerequisite to doing this. Crusel v. Hermitage Planting Co., 114 La. 921, 38 South. 648.

Defendant had the right (subject to the nonimpairment of the legal rights of the plaintiff) to put an end to further sawing and delivering by plaintiff of the lumber which was the subject of the contract between the parties. The clauses in the contract in that regard were for its benefit, and it could waive the same if it thought proper under reservation of plaintiff's rights in the premises. The plaintiff was not called upon in order to obtain the remuneration to result to

it from the contract to continue sawing and delivering the lumber to the 1st of January, 1908. It had no right to do so when defendant ordered otherwise.

When defendant refused to allow the plaintiff to further saw and deliver the lumber, it thereby relieved the latter from its obligation to do so, but the plaintiff none the less was entitled to the benefit to it which would have resulted had the sawing of the lumber and the delivery of the same been continued to the end of the contract. By directing the ceasing of the sawing and delivery of the lumber, the defendant elected in law to place matters in the status of a completed contract. It could not thereafter deal with the plaintiff's rights upon the theory that events might possibly happen in the future which would have put an end to the contract. It could not convert possible fortuitous circumstances into actualities, and deal with them as such, and utilize them to the prejudice of the plaintiff. Plaintiff's mill has not been destroyed by fire, no boiler has exploded, and the lumber which was the subject of the contract remained intact until the termination of the contract responsive to all legal claims which the plaintiff might have in regard to it.

We do not appreciate the force of defendant's argument that plaintiff had up to July 23, 1906, made no profits under the contract, that after that date it was so financially embarrassed that it would have been unable to have completed the contract. Plaintiff had up to July 23d carried out the contract, and was continuing to do so, when ordered to stop sawing and making delivery. The plaintiff had the right to assume that defendant would by payments to it furnish the means necessary to carry on its operations, and it doubtless would have continued them on, unless defendant, by failing to make payments, should deprive it of its means to do so, but it is not necessary to discuss what it might

or might not have done, for defendant had, under the circumstances, no concern in that matter.

Plaintiff had no motive after July 23, 1906, to continue sawing the lumber or to sell it to third parties. The evidence shows that after July 23, 1906, the weather would have been favorable for plaintiff's operations; also, that its mill could have sawed without difficulty 12,000 feet of lumber a day (its capacity being 25,000 feet a day), and that the lumber on hand was sufficient to keep it employed until after January 1, 1908. The evidence further shows that plaintiff would have made $4 net by the sawing and delivery of every thousand feet. Plaintiff had secured a fixed price for the timber which belonged to it.

We are of the opinion that, had the defendant not forced the plaintiff to desist from sawing and delivering the lumber, plaintiffs would have carried out the contract. We do not think that defendant has legal ground to complain of the judgment, and are satisfied that, under the evidence, the trial judge's estimate of the amount of damages is a conservative one.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, affirmed.