A majority of the members of the court have come to the conclusion that the judgment of the district court, rejecting the state's demand, is correct.
The suit was for $130,378.78, alleged to be the value of seven-eighths of the oil taken from three wells that were drilled and operated by the Pure Oil Company on land that belonged to the Caddo levee board when the wells were drilled and when the oil was produced. The land is on the shore of Ferry Lake, below or inside of the Gulf level elevation of 173.09 feet, established by the Kidder survey approved in 1915. As Ferry Lake was a navigable body of water when Louisiana was admitted into the Union, the land on which these wells were afterwards drilled became the property of the state in virtue of her sovereignty. State v. Bozeman, 156 La. 635, 101 So. 4; McGlothlin v. Shreveport,160 La. 101, 106 So. 708; Ellerbe v. Grace, 162 La. 846, 111 So. 185.
The land was transferred to the Caddo levee board by an act of the Legislature, if not by the Act 74 of 1892, creating the levee district, surely by the Act 160 of 1900, extending the limits of the district and conveying to the levee board every character of land belonging to the state within the district. There is no dispute about that. See Ellerbe v. Grace, Register of the State Land Office, 162 La. 846, 111 So. 185. The conveyance, in the second section of the act of 1900, was in these broad terms, viz.:
 "That in order to provide additional means to carry out the purpose of this act * * * all lands now belonging or that may hereafter belong to the state of Louisiana, and embraced within the limits of the levee district as herein constituted, shall be and the same are hereby granted, given, bargained, donated, conveyed, and delivered unto the said board of commissioners of the Caddo levee district," etc. *Page 350 
The statute then reserved to all persons whose lands within the district had been sold or forfeited to the state for nonpayment of taxes 6 months' grace in which to redeem their titles; and it was made the mandatory duty of the state auditor and of the register of the state land office thereafter to make instruments of conveyance to the levee board, in fee-simple title, of all of the state's lands within the district, viz.:
 "After the expiration of the said 6 months it shall be the duty of the auditor and register of the state land office on behalf of and in the name of the state to convey to the said board of levee commissioners, by proper instruments of conveyance, all lands hereby granted or intended to be granted and conveyed to the said board whenever from time to time the said auditor or register of the state land office or either of them shall be requested to do so by the said board of levee commissioners or by the president thereof, and thereafter the said president of the said board shall cause the said conveyances to be properly recorded in the recorder's office of the respective parishes wherein the said lands are located and when the saidconveyances are so recorded the title to the said landswith the possession thereof shall from thenceforth vestabsolutely in the said board of commissioners, itssuccessors, or grantees." (The italics are ours.)
Accordingly, on the 6th of July, 1901, the state auditor and the register of the state land office signed and issued to the Caddo levee board an instrument of conveyance of the land on which the three wells were afterwards drilled by the Pure Oil Company, and the instrument of conveyance was immediately recorded in the parish of Caddo, where the land is situated. Thenceforth the title and possession of the land was vested absolutely in the levee board. As this court said in State v. Tensas Delta Land Co., 126 La. 74, 52 So. 222, in refusing a rehearing:
 "The Legislature vested the absolute title to the lands in controversy in the Board."
See, also, State ex rel. Levee Board v. Capdervielle,142 La. 111, 76 So. 327; Atchafalaya Land Co. v. Grace, 143 La. 637, 79 So. 173; State ex rel. Levee Board v. Grace, 145 La. 962, 83 So. 206; Atchafalaya Land *Page 351 
Co. v. F.B. Williams Cypress Co., 146 La. 1047, 84 So. 351; Atchafalaya Land Co. v. Dibert, Stark Brown Cypress Co.,157 La. 689, 102 So. 871; Ellerbe v. Grace, 162 La. 846, 111 So. 185; United States ex rel. Louisiana v. Jack, 244 U.S. 397, 37 S. Ct. 605, 61 L. Ed. 1222. There is nothing to the contrary in the decision rendered in State ex rel. Board of Commissioners of Tensas Basin Levee District v. Grace, Register of State Land Office, 161 La. 1039, 109 So. 830.
By the Act 268 of 1908, p. 394, the board of commissioners of the Caddo levee district was authorized to lease the mineral lands within the district, on such terms and conditions as the board might deem best and for such time as the board might deem proper, provided the royalty to be received by the board should be not less than one-eighth of the oil or gas. Accordingly, on the 10th of October, 1910, the board entered into a contract purporting to lease to the Pure Oil Producing Company (predecessor of the Pure Oil Company), for a bonus of $100 an acre and the usual one-eighth royalty, all of the land owned by the board in the tract of 160 acres described as the W. 1/2 of S.W. 1/4 of section 3 and E. 1/2 of S.E. 1/4 of section 4, in T. 20 N., R. 16 W. The intention expressed in the contract was to lease all of the land which the board had not theretofore disposed of in the area lying below or inside of the mean Gulf level elevation, and therefore on the shore of Ferry Lake, in that subdivision of 160 acres. The lessee paid a bonus of $4,000, on an estimate of 40 acres, and it was stipulated that a survey should be made so as to determine the exact area below the Gulf level elevation, and that the lessee would add to the bonus paid, at the rate of $100 per acre, for any excess in the area over and above the estimate of 40 acres. At that time the exact location of the 173.09 feet elevation or contour line, which was afterwards established by the Kidder survey, was not known. The Kidder survey was not commenced until 1913 and was not completed until 1915. There *Page 352 
was no doubt or dispute, however, that the levee board owned all of the land up to — and only the land up to — the line which should mark the Gulf level elevation, wherever that line should be; and the intention of the parties to the contract was that the levee board should lease to the Pure Oil Company all land owned by the board in that 160-acre subdivision, which land, as both parties knew, extended up to a true and correct location of the Gulf level elevation line, wherever it should be. For the purpose of locating the line, the parties mutually selected the surveyor, H.E. Barnes. Not having the data or information on which Kidder afterwards based his survey, Barnes located the elevation line below the true and correct location of 173.09 feet, and thus included in the area of land leased by the levee board to the Pure Oil Company only 55.992 acres. The tract on which the Pure Oil Company afterwards drilled the three wells, which produced the oil which gave rise to this lawsuit, is the area lying between the elevation line erroneously located by the Barnes survey and the elevation line of 173.09 feet which was afterwards correctly located by the Kidder survey. The Pure Oil Company paid the levee board the additional bonus of $1,599.20 for the excess area of 15.992 acres at $100 per acre, and, of course, would have paid willingly for the greater excess in area if Barnes had not erred in his location of the boundary line. As the Pure Oil Company had also a similar lease — with the same royalty stipulation — on the adjacent high land, formerly belonging to the United States government, it made no difference to the Pure Oil Company where the elevation line dividing the high land from the levee board's land was located, except to determine who, of the two lessors, should receive the one-eighth royalty from any well drilled on either side of the line dividing the land of one lessor from the land of the other.
It cannot be doubted that, if this suit against the Pure Oil Company for trespass had been brought by the levee board, the *Page 353 
Pure Oil Company could demand a reforming of the contract of lease — or rather a conforming to the original contract — so as to include within the terms of the lease the land on which these three wells were drilled. Either party is always permitted, in a suit between the parties to a contract, to correct any error in the instrument purporting to evidence the contract, so as to make it express truly and correctly the intention of the parties. Levy v. Ward, 33 La. Ann. 1033; Vignie v. Brady Charpaux, 35 La. Ann. 560; Armstrong v. Armstrong, 36 La. Ann. 551; Dickson v. Dickson, 36 La. Ann. 872; Bryan v. Wisner, 44 La. Ann. 832, 11 So. 290; Mary E. Gladdish v. Leon Godchaux, 46 La. Ann. 1571, 16 So. 451; Robinson v. Atkins, 105 La. 793, 30 So. 231; Gray v. Coco, 113 La. 33, 36 So. 878; Penn v. Rodriguez, 115 La. 174, 38 So. 955; Chaffe v. Minden Lumber Co., 118 La. 753, 43 So. 397; Coleman v. Thibodaux, 119 La. 474, 44 So. 269; Sims v. Jeter,129 La. 262, 55 So. 877; Garrett v. Spratt, 131 La. 707, 60 So. 199; Frantom v. Nelson, 142 La. 850, 77 So. 767; Giovanovich v. Breda,149 La. 402, 89 So. 251; Waller v. Colvin, 151 La. 765, 92 So. 328.
The Attorney General, in this suit on behalf of the state, charges that the Pure Oil Company was a mere trespasser on that part of the E. 1/2 of S.E. 1/4 of section 4 and W. 1/2 of S.W. 1/4 of section 3 which was omitted from the description of the land leased by the levee board to the Pure Oil Company by the error of Barnes, the surveyor. The authority of the Attorney General to bring the suit on behalf and in the name of the state — instead of leaving it to the levee board to assert whatever claim there may be against the Pure Oil Company for the oil taken from the land, and for which the lessor of the adjacent high land was paid the one-eighth royalty by mistake — is that, by a compromise judgment rendered by the district court of Caddo parish, on the 14th of November, 1921, in a suit filed by the Attorney General on behalf *Page 354 
and in the name of the state against the levee board, in April, 1919, the instrument of conveyance executed by the state auditor and the register of the state land office on the 6th of July, 1901, transferring this land to the levee board, was annulled, and the title to the land then reverted to the state. The judgment did not declare that the instrument of conveyance from the state to the levee board dated the 6th of July, 1901, was null ab initio. Here is the language in which the instrument of conveyance to the levee board was annulled, viz.:
 "And as to said property, as to which the title to the state is hereby recognized, the act of certification, of date July 6, 1901, from the register of the state land office and the auditor of the state of Louisiana, as recorded in Conveyance Book 28, p. 329, Records of the Parish of Caddo, is hereby annulled and set aside."
If the district court of Caddo parish had decreed that the instrument of conveyance or certification, of date July 6, 1901, was null ab initio, the judgment would have been contrary to the recent decision by this court in Ellerbe v. Grace, Register,162 La. 846, 111 So. 185; and such an erroneous ruling by the district court would not have been binding upon the Pure Oil Company — even if the judgment had not been merely a judicial confirmation of a compromise agreement between the state and the levee board — because the Pure Oil Company was not a party to the suit of the state against the levee board. In Ellerbe v. Grace, supra, this court said:
 "Act No. 160 of 1900, above mentioned, has placed the status of former state lands in the Caddo levee district beyond the domain of further controversy, whether that act be considered as a legislative interpretation of the grant intended by the act of 1892 or as an additional grant. If the former, then this authoritative declaration of the state's intention is binding upon the state's officers. Cf. State v. New Orleans City L.R. Co., 104 La. 685, 29 So. 312. And if the latter, then this new grant inured at once to the benefit of those who hold from the levee board; and the state and all state agencies are therefore forever estopped thereby from ever thereafter asserting title to the lands in the face *Page 355 
of the obligation of warranty resulting from such grant" (citing a long list of decisions).
It is true that, on account of the error made by the surveyor, Barnes, the Pure Oil Company had no lease on the land on which these three wells were drilled. But all of the oil which the state is suing for was produced before the land was reconveyed to the state by the compromise or consent judgment dated the 14th of November, 1921. That judgment did not purport to transfer to the state any right of action which the levee board might have had to sue the Pure Oil Company for trespass; and the judgment could not, and did not purport to, deprive the Pure Oil Company of the substantial defense which it would have if the levee board should sue the Pure Oil Company for trespass — to correct the error in the description of the land as surveyed by Barnes — so as to make the description conform with the original contract of the levee board to lease to the Pure Oil Company all of the land owned by the board within the 160-acre subdivision.
It is well settled that a right of action for damages for trespass already committed does not pass with a conveyance of the land that was trespassed upon, without an express transfer of or subrogation to the right of action for the trespass. Clark v. Warner Co., 6 La. Ann. 408; Payne v. James and Trager, 42 La. Ann. 230, 7 So. 457; Matthews v. Alsworth, 45 La. Ann. 465, 12 So. 518; Bradford v. Damare, 46 La. Ann. 1530, 16 So. 487; Pokorny v. Pratt, 110 La. 609, 34 So. 706; McCutchen v. Texas 
Pacific Railway Co., 118 La. 436, 43 So. 42; Taylor v. New Orleans Terminal Co., 126 La. 420, 52 So. 562, 139 Am. St. Rep. 537.
Not only was there no transfer or subrogation to the state of any claim which the levee board had or might have had for any act of trespass theretofore committed on the land that was retroceded to the state by the compromise judgment, but the judgment itself shows affirmatively that there was no intention to transfer to the state any such *Page 356 
right of action. The judgment declared, first, that the instrument of conveyance to the levee board of the lands described in the judgment was thereby annulled and set aside; second, that the contracts theretofore entered into by the board, requiring an expenditure of approximately $1,000,000, and for which the board's future revenues from the lands were pledged, were recognized and ratified; third, that, in order to provide for the expenditures aforesaid, the board should have one-half of the royalties already accrued from leases theretofore made by the board, whether in bank or retained by the oil companies, up to and including the oil run during the preceding month, October, 1921, and that the state should have the other half thereof; fourth, that the levee board should have $500,000, payable out of one-half of the royalties accruing after the 31st day of October, 1921; fifth, that all leases theretofore granted by the levee board were thereby ratified and the rights and obligations of the board as lessor were assumed by the state, subject, however, to the board's right to one-half of the future royalties to the extent of $500,000, as aforesaid, and, in that connection, the plea which had been filed by the defendant Gulf Refining Company, to the effect that the obligations of the contracts of lease theretofore granted by the board should not be impaired in violation of section 10 of article 1 of the Constitution of the United States, was sustained; and sixth, that all demands of the state for royalties received by the board before the institution of the suit, and all demands for annulment or cancellation of leases theretofore made by the board, were thereby rejected. This last paragraph in the judgment plainly rejected any demand on the part of the state for any oil taken from the land before the institution of the suit, or for interference with any of the contracts of lease theretofore made by the board, viz.:
 "It is further ordered, adjudged, and decreed that all demands on the part of the state of *Page 357 
Louisiana, plaintiff herein, whether in the original or amended petition, relating to the revenues received by the said board of commissioners of the Caddo levee district of Louisiana from any of the lands in controversy prior to the institution of this suit, as well as the demands herein made for the annulment or cancellation of said leases or other contracts made by said board, affecting the said property, be and the same are hereby rejected."
It will not do to say that the instrument of conveyance dated the 6th of July, 1901, signed by the state auditor and the register of the state land office, pursuant to section 2 of Act 160 of 1900, conveying this land to the levee board, merely placed the property under the control of the levee board as a state agency for the constructing and maintaining of levees. The Legislature itself declared, in the statute of 1892 and of 1900, that, when the instrument of conveyance was placed on record, the title to the land vested absolutely in the levee board, and this court has said the same thing in every one of its many decisions on the subject. It was also said in all of those decisions that the Legislature, having created the board and having granted the land to it, could revoke the grant at any time, but that it could not interfere with the rights of third parties resulting from their dealings with the board during its ownership of the land. The board is a state agency, of course, just as any other subdivision incorporated by an act of the Legislature is a state agency; but the board has the right to sue and be sued, and it alone must assert its rights of action. The Attorney General has no right to sue for and in the name of the state on a cause or right of action possessed only by the levee board. That identical question was propounded and decided against the state in the case of State v. Tensas Delta Land Co., 126 La. 59, 52 So. 216. The court said:
 "The argument that the said board is nothing more than a mere agency or instrumentality of the state, and that therefore the state may sue in every case where the said board might sue, contains a manifest non sequitur. Every city, town, and parish of the state is a mere *Page 358 
agency or instrumentality of the state; but no one would venture to say that the Attorney General could ignore the existence of these corporations and enforce, in the name of the state, any cause of action which any of them might have.
 "The legislative control over corporations of the character of this levee board is much more complete than over municipal corporations proper and parishes — it made them, and can at any time abolish them, so long as the obligations of their contracts are not thereby impaired — but these corporations have their existence and exercise their functions by and under the Constitution and statutes of the state, and so long as these established laws remain in force it is they which must regulate the property and other rights of said corporations and their modes of action, and the disposition of their property, and their rights to sue and to be sued. If one of these corporations has a right of action, the proper functionary to enforce same is the governing body of the corporation, and not the Attorney General, or the State."
In refusing an application for a rehearing in that case, the court again said:
 "The Legislature vested the absolute title to the lands in controversy in the board of commissioners of the Tensas levee district, with full power to sell the same on such terms as the board might deem proper. The Legislature also vested in said board full power to sue and be sued, and to stand in judgment, in all matters relating to their gestion and trust. * * *
 "The General Assembly has the power at any time to authorize the Attorney General to institute actions for the use and benefit of the taxpayers and people of any particular levee district. But as the General Assembly has vested the power to sue and be sued in the board of commissioners of the Tensas levee district, and has vested no such co-ordinate power in the Governor or Attorney General, we are of the opinion that the institution of this suit in the name of the state is unauthorized."
The judgment of nonsuit against the levee board as intervener in this case, dismissing the intervener's demand for supplement of the bonus paid by the Pure Oil Company and for the one-eighth royalty, is correct, because the state, as plaintiff, did not claim either the bonus or the one-eighth royalty, and they were therefore not in contest. The state's claim was only for seven-eighths of the oil taken from the land. The judgment *Page 359 
is correct also in so far as it allows the intervener to recognize and affirm that the land, on which the three wells were drilled, was intended to be included in the lease to the Pure Oil Company, but was omitted through the error of the surveyor.
The judgment heretofore rendered by this court having been set aside by the granting of a rehearing, the judgment of the district court is now affirmed at appellants' cost. The right is reserved to the state to apply for a rehearing within the legal delay.
THOMPSON, J., dissents.